**David S. PENNER and Jason W. Penner, Plaintiffs,**

v.

**UNITED STATES POSTAL SERVICE, Defendant.**

No. 2:93CV00489.

United States District Court, M.D. North Carolina, Greensboro Division.

Feb. 21, 1995.

David S. and Jason W. Penner, St. Petersburg, pro se.

Walter C. Holton, Jr., U.S. Atty., Gill P. Beck and Benjamin H. White, Jr., Asst. U.S. Attys., Greensboro, NC, for defendant U.S. Postal Service.

## MEMORANDUM OPINION

SHARP, United States Magistrate Judge.

This matter came before the court for a bench trial on February 1, 2, 3, and 6, 1995. At trial, the court heard the evidence presented by Plaintiffs David S. Penner and Jason W. Penner ("the Penners"), who proceeded *pro se,* and Defendant United States Postal Service ("USPS"), which was represented by the United States Attorney. Having considered the evidence, the court now enters its findings of fact and conclusions of law. Findings (1)–(37) are grounded upon the parties' Joint Stipulation of Facts and the terms of the written lease between the parties (the "Lease"), while findings (38)–(63) are factual findings made by the court on the basis of conflicting or disputed evidence.[1] To any extent the court makes factual determinations in the discussion section of this opinion, such determinations are Rule 52 findings in addition to the numbered findings set out immediately below.

### I. FINDINGS OF FACT

(1) During 1966–1967, the United States Postal Service (by its predecessor in interest) sought to establish a Main Post Office in Burlington, North Carolina. The USPS advertised for the submission of lease proposals, which included the requirement that the prospective lessor lease the property in accordance with the terms of a particular lease (Joint Exhibit "JE" 1) and construct the post office in accordance with specifications set forth in *Construction Requirements for*

---

1. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

*Leased Postal Facilities,* dated March 1963 (JE 2).

(2) On or about June 23, 1967, Hodges Realty Company entered into the Lease (JE 1) with the USPS regarding the Burlington, North Carolina Main Post Office. (JE 1.) Pursuant to the Lease, the Lessor Hodges Realty Company constructed the Burlington Post Office in accordance with *Construction Requirements for Leased Postal Facilities,* dated March 1963. (JE 2.)

(3) Since construction in 1967, the Burlington Post Office has been rented exclusively by the USPS and has served as the Main Post Office for Burlington.

(4) The Lease provided for a twenty (20) year term, with six five-year options. The rent for both the original and options terms was fixed at $40,872.00 annually, which equates to $3,406.00 per month. (JE 1.) The USPS has exercised its second five-year option to renew the Lease.

(5) The Lease required the lessor to:

maintain the demised premises, including the building and any and all equipment, fixtures, and appurtenances, whether severable or non-severable, furnished by the lessor under this lease in good repair and tenantable condition. . . .

During the continuance of the lease, the interior of the building, including, but not limited to, the walls and ceilings, shall be repainted at least every five (5) years unless required more often because of damage from fire or other casualty, or unless the five year period is specifically extended in writing by the Contracting Officer. The required painting shall be completed not later than six (6) months following the end of the first and each successive five (5) year period during the continuance of the lease.

(JE 1, Lease, ¶ 7.)

If any building or any part of it on the leased property becomes unfit for use for the purposes leased, the lessor shall put the same in satisfactory condition, as de-termined by the Post Office Department, for the purposes leased.

(JE 1, Lease, ¶ 10c.)

(6) On or about June 16, 1972, M.D. Hodges Enterprises, Inc., successor to Hodges Realty Company, conveyed title to the Burlington Post Office to Joseph Penner. The conveyance was expressly subject to the terms of the Lease with the USPS.

(7) On or about December 26, 1974, Joseph Penner and Grace Penner sold the Burlington Post Office to Sol Finkelman and Helen S. Finkelman ("Finkelmans") for good and valuable consideration that included an all-inclusive mortgage note ("Penner Note") in the principal amount of $635,000.00. The conveyance was subject to the terms of the Lease with the USPS.

(8) The Finkelmans secured payment of the Penner Note by their execution of a second deed of trust in favor of Joseph and Grace Penner ("Penner Deed of Trust") on the Burlington Post Office.

(9) After selling the Burlington Post Office to the Finkelmans, Joseph Penner managed the property for the Finkelmans from 1974 through April 3, 1989. From April 4, 1989 until the Penners took title on June 22, 1993, James R. Agnew of Avery Company was the property manager.

(10) By deed dated June 29, 1975, the Finkelmans quitclaimed their interest in the Burlington Post Office to Burlington Properties Co. ("Burlington Properties"), a limited partnership formed under the laws of the State of California for which Sol Finkelman was a general partner. The conveyance was subject to the terms of the Lease with the USPS.

(11) In 1980 or 1981, Kerwin Baker of Spectrum Painting and Paper Hanging painted the interior of the Burlington Post Office, pursuant to a contract with Joseph Penner. The lessor has not painted the interior of the Post Office since that time.

(12) On February 18, 1986, Sol Finkelman executed a power of attorney on behalf of Burlington Properties Company appointing Joseph Penner attorney in fact for Burlington Properties Company in regard to the Burlington Post Office. (JE 3.) Based on

the power of attorney, the USPS made payments under the Lease to Joseph Penner.

(13) On or about October 17, 1987, Burlington Properties entered into a mortgage loan with First Federal Savings and Loan Association of Burlington, North Carolina ("First Federal") in the amount of $275,000.00. Joseph and Grace Penner executed a Subordination Agreement, subordinating the Penner Deed of Trust to the First Federal Deed of Trust.

(14) By assignment dated October 26, 1987, Joseph Penner and Grace Penner assigned the Penner Note and Penner Deed of Trust to David S. Penner and Jason W. Penner, Plaintiffs. The USPS did not receive a copy of the assignment until November 13, 1992.

(15) On or about June 16, 1988, Thomas Paint and Paper Company submitted a painting bid to the Burlington Post Office. (JE 4.)

(16) On or about June 24, 1988, Oakley Paint and Paper Company submitted a painting bid to the Burlington Post Office. (JE 5.)

(17) On or about May 30, 1989, Postmaster Talley of the Burlington Post Office, by certified mail, advised Joseph Penner that the Burlington Post Office needed certain deferred maintenance, including interior and exterior painting, by letter dated May 30, 1989. (JE 6.) The USPS received no response and the requested maintenance was not performed.

(18) On or about July 28, October 30, and December 14, 1989, and January 3 and February 28, 1990, S.D. Curran, Manager, Support Services, USPS, by certified mail, notified the lessor or agents of the lessor that the Burlington Post Office needed the following deferred maintenance items corrected:

(a) Interior and exterior painting,

(b) Replace bad bearings in air conditioner pump, and

(c) Repair potholes, align paving and sunken area of drain in parking lot.

(JE 7–11.) The USPS received no response and the requested maintenance was not performed.

(19) The parties have stipulated that the USPS provided proper notice and followed appropriate USPS procedures to initiate the work and rent withhold at issue in this case. Plaintiffs do not agree, however, that the work performed and plans and specifications constituted lessor maintenance under the terms of the Lease.

(20) On or about March 29, 1990, Project Manager John Little of the USPS requested that ENG/6A, an architecture and engineering firm practicing in Asheville, North Carolina, provide a fee proposal for the following work for the Burlington Post Office:

(a) Interior and exterior painting,

(b) Repair of exterior stucco,

(c) Repair/replacement of HVAC bearings, and

(d) Repair of broken and sunken pavement.

The work would be performed pursuant to an Architect–Engineer Term Contract for Repairs and Alterations (Contract No. 363192–88–0254), dated February 17, 1988.

(21) Architect Gil Guthrie of ENG/6A was assigned to the project. On April 2, 1990, he visited the Burlington Post Office to review and photograph the existing conditions.

(22) On July 30, 1990, ENG/6A submitted Specifications (JE 12) and Plans (JE 13).

(23) On August 19, 1991, the Postal Service issued a Work Order to I.L. Long Construction ("Long"), pursuant to an Indefinite Quantity Contract/Construction Work Order with Long. (JE 14.) Long solicited bids regarding the painting and received a bid from Pffaf's Inc. (JE 15), Thomas Paint and Paper Co., dated July 22, 1991 (JE 16), and S & L Painting & Decorating, Inc., dated July 24, 1991 (JE 17). The Work Order included the following maintenance items:

| | |
|---|---|
| 02.1/20/N01 | Lamp concrete drainage pipe |
| 02.1/44/001 | Saw cutting, asphalt for 1 inch depth |
| 02.1/44/010 | Saw cutting, asphalt each additional inch of depth |
| 02.3/03/170 | Backfill, machine compacted in 6″ to 12″ layers over 10 cu. yd. material on site |
| 02.3/18/005 | Excavate, trench, to 4′ wide, 3′ to 4′ deep, tractor back hoe |
| 02.6/05/011 | Base, crush stone # 3, delivered to site, 25 mile radius |

| | | |
|---|---|---|
| 02.6/10/F03 | Bituminous paving, wearing course, 1½" thick compacted, including tack coat, over 400 SY | |
| 02.6/12/F01 | Rout out expansion joints or cracks in existing asphalt pavement 1" deep. Sandblast joints and repour with joint filler. | |
| 02.6/32/001 | Painting, lines on pavement, reflectorized white or yellow, 4" wide | |
| 02.6/35/100 | Parking barrier, precast concrete, including dowels, 6".10".6'0" | |
| 03.3/37/015 | Patching concrete, floors, epoxy grout | |
| 03/3/37/215 | Patching concrete, walls, epoxy grout | |
| 09.8/20/F38 | Painting, interior, existing, concrete block, filler or conditioner + 1 coat | |
| 09.8/20/F67 | Painting, miscellaneous metal, new & existing door frames, 2 coats | |
| A/E Fees | Necessary drawings and scope of work | |

(24) The costs associated with the work are as follows:

**DRAINAGE PIPE WORK:**

| | | |
|---|---|---|
| 2.120N01 | Lamping | $ 567.00 |
| 2.144001 | Saw Cutting | 277.02 |
| 2.144010 | Saw Cutting | 459.27 |
| 2.303120 | Back Filling | 1,458.00 |
| 2.318005 | Excavating | 2,462.40 |
| 2.328005 | Excavating | 463.32 |
| 2.605011 | New Base | 235.06 |

**PAVING WORK:**

| | | |
|---|---|---|
| 2.610F03 | Bituminous Paving | $17,103.56 |
| 2.612F01 | Cracks | 546.75 |
| 2.632001 | Painting | 405.00 |
| 2.635100 | Parking Barr. | 124.74 |

**INTERIOR PAINTING:**

| | | |
|---|---|---|
| 9.820F38 | Paint–Interior | $16,099.48 |

**EXTERIOR WORK:**

| | | |
|---|---|---|
| 3.337015 | Patch Floor | $ 128.04 |
| 3.337215 | Patch Walls | 1,479.87 |
| 4.512042 | Pres Clean | 10,661.63 |
| 4.552070 | Tuckpoint | 301.32 |
| 9.820690 | Paint–Misc | 22.28 |
| 9.820700 | Paint–Misc | 12.35 |
| 9.820810 | Paint–Misc | 1,164.38 |
| 9.820F03 | Paint–Misc | 3,266.33 |
| 9.820F67 | Paint–Misc | 1,539.06 |

| | |
|---|---|
| **ARCHITECT** | $ 5,004.00 |
| Less Construction Administration | |
| | <1,809.00> |
| **TOTAL** | $61,971.86 |

(JE 14.)

(25) Long entered into a painting subcontract with Thomas Paint & Paper Company (JE 18) and a paving subcontract contract with Horne Paving Company (JE 19) regarding the work performed at the Burlington Post Office.

(26) The results of the lamping test revealed that the concrete pipe was separated in three places. (JE 20.)

(27) On June 1, 1992, Plaintiffs appointed Joseph Penner as managing agent for all aspects of their interest in the Burlington Post Office.

(28) On or about June 15, 1992, the Penners commenced a foreclosure proceeding on their all-inclusive note and second deed of trust (Penner Note and Penner Deed of Trust).

(29) On October 6, 1992, the Penners filed Civil Action No. 92–CVS–2153 in the Superior Court of Alamance County, North Carolina against Burlington Properties and Sol Finkelman as General Partner seeking to foreclose on the Penner Note and Penner Deed of Trust.

(30) As part of the foreclosure action, the Penners garnished two bank accounts belonging to Burlington Properties on October 13, 1992. The accounts contained a total of $50,128.00.

(31) On or about September 21, 1992, Martina Pierce, Contracting Officer for the USPS in Greensboro, advised Burlington Properties that the USPS was implementing a $67,-267.68 (inclusive of interest) rental withhold to pay for the work performed on the Burlington Post Office. The USPS also provided Financial First, FSB ("Financial First"), successor to First Federal, a copy of said letter advising of the rent withhold. (JE 22.)

(32) On or about October 13, 1992, Martina Pierce confirmed to Jim Agnew, property manager for Burlington Properties, that the Postal Service would withhold $67,267.68 from the rental: $2,802.82 per month for a period of twenty-four (24) months. (JE 23.)

(33) On October 22, 1992, Joseph Penner wrote to the USPS objecting to the withhold and requesting further information on the work performed. (JE 24.) Joseph Penner subsequently followed up his letter of October 22, 1993 with two phone calls to Bob Howie of the Greensboro Facilities Office who advised him that the matter was still under review.

(34) On December 21, 1992, Jeff Seria of the USPS advised the lessor, through its agent, of a reduction in the rent withhold. The withhold was reduced by $15,428.29. (JE 26.)

558

(35) On June 22, 1993, the Penners completed their foreclosure action on the Penner Note and Penner Deed of Trust and took title to the Burlington Post Office via Commissioner's Deed.

(36) The definition of "good repair and tenantable condition" as set forth in the Lease means:

[A] building which is maintained in good repair and tenantable condition is one maintained at a level consistent with comparable buildings and is fit for the purposes for which it is leased. In determining the fitness of a facility one must consider the reasonable intentions of the parties at the time the lease was entered into, the age and structural character of the leased property, the use to which the property is to be put and the safety and health of those who occupy and use the facility. [G]ood repair and tenantable condition is generally, the condition which exists at the beginning of the lease, less ordinary wear and tear, with reasonable maintenance having been performed at the facility to assure continued fitness for use, assuming the building was in good condition when accepted.

Good repair and tenantable condition generally does not include repairs or maintenance intended only for aesthetic purposes (e.g., outward appearance of a building or wall), but rather that work necessary for continued functional use of the facility. Nor is preventive maintenance, the purpose of which is to prevent or forestall the need for future maintenance or repairs (e.g., seal coating an asphalt surface to avoid future deterioration), included within the definition.

(*See* JE 30.)

(37) USPS Handbook RE-1 sets forth specific guidelines on paving repairs:

§ 745.4 Localize Repairs—Localized repair of distressed pavement areas with an overlay is normally less expensive than complete pavement replacement and can be adequate in most cases: The Postal Service is not entitled to completely new pavement if localized repairs are likely to provide driveway, parking, and maneuvering areas in a satisfactory condition in accordance with the terms of the lease contract.

(JE 31.)

*Interior Work on Building*

(38) In 1991, at the time of repair, the interior walls of the Burlington Post Office were in a state of gross disrepair. Many of the walls were extensively water-stained and mildewed. In places the paint finish had completely disappeared and the surface of the underlying concrete masonry units were exposed. The finish of the walls was so deteriorated in places that it would rub off on any person who came in contact with a wall.

(39) The Lease requires the lessor to paint the interior at least every five years, a covenant the lessors were in breach of in 1991 since the interior of the Post Office had not been painted since 1981, despite frequent requests by the USPS. Plaintiffs concede that interior painting is a lessor maintenance responsibility as provided by the terms of the lease, but they contend that the USPS spent an unreasonable amount of money in repainting the interior of the Post Office.

(40) The reasonable cost of the repainting of the Post Office interior totalled $17,638.54. (9.820F38 and 9.820F67 on the Work Order, JE 14.) The USPS was charged by Long for interior painting work consisting of spot priming and one coat of latex finish paint, an absolutely minimum specification in view of the extensive stain damage to the walls. As it turned out, this application did not cover the water-staining and other damage to the interior walls, and the painter applied additional coats in many places at his own expense, *not* charged to the USPS or, through the rent withhold, to the Penners. The contract price for interior painting resulted from competitive bidding.

(41) The Penners do not contest liability for $5,799.72 for interior painting (the amount they contend is the reasonable cost of an adequate painting job), but the court finds that the actual interior painting cost of $17,638.54 is reasonable and is the responsibility of the lessor under the Lease.

(42) Plaintiffs have stipulated that the remaining interior work reflected on the Work Order—for floor patching—is an item of lessor maintenance and that $128.04 was a reasonable cost. Thus, the total reasonable cost of interior work at the Burlington Post Office under the Work Order was $17,766.58.

### Exterior Work on Building

(43) On September 21, 1992, the USPS notified Burlington Properties Company of the establishment of a $61,971.86 (plus interest) rent withhold for repair work performed at the Burlington Post Office. The work covered by this withhold included the following work on the exterior of the Post Office: patching walls, pressure cleaning, tuckpointing masonry, and painting. The total sum charged for exterior work in the original rent withhold of September 1992 was $16,908.16.

(44) On December 11, 1992, the USPS reduced the rent withhold applicable to the Penners by $15,428.29, the entire reduction related to exterior work on the Post Office. The USPS determined that the lessor's appeal from the original rent withhold was valid to the extent of the reduction. Under the reduced withhold of $46,543.57 (plus interest), only $1,479.87 for patching work related to exterior work.

(45) The exterior of the Burlington Post Office, immediately before the repairs of 1991, was in a state of gross disrepair. The exterior paint was largely worn away, with extensive peeling and cracking of that paint that remained. The underlying stucco material was badly cracked and deteriorated, allowing water to penetrate the exterior walls of the building. The stucco had decayed in many places, and pieces had fallen off completely.

(46) The reasonable cost of repairing the exterior walls was $1,479.87, the amount charged to the USPS. The cost was a product of competitive bidding.

### The Depression over the Drainage Pipe

(47) With regard to repair of the depression over the drainage pipe in the parking lot of the Burlington Post Office, the repair encompassed a lamping test, saw cutting, back fill, excavation, and provision of a new base (plus the overlay applied to the entire lot). The depression ran through an extended portion of the lot along one side of the building. It varied in depth from 3″ to 6″ for the most part, but had, by the time of the repairs in 1991, reached a depth of nearly 10″ in one area. This area was barricaded off for the last eight months or so before the 1991 repairs.

(48) The depression resulted from a failure of the sub-base beneath the asphalt as a result of separations within the drainage pipe. The depression represented a structural failure of the asphalt. The USPS was entitled under the lease to an all-weather surface with reasonable drainage features. The depression deprived the USPS of that entitlement. The depression impeded postal operations by causing mail buggies to tip over on occasion and, at least as to the area of the most severe depression, by posing a safety hazard to postal vehicles and workers and to the public. The asphalt over the depression had failed as a result of sub-base subsidence caused by pipe separations and was, at least as to its deepest area, rapidly worsening in 1991.

(49) The reasonable cost of repair of the depression was $5,922.07 (plus some portion of the overlay cost).

### Paving

(50) The parking area where postal carriers parked their vehicles had numerous large cracks and severe "alligatoring" throughout. On numerous occasions, buggies carrying mail overturned in the lot, their wheels having caught in large cracks or other discrepancies in the asphalt pavement of the lot.

(51) The pavement around catch-basins had become below the grade of portions of the storm drains, so that water ponded near the catch-basins. Asphalt adjoining the concrete ramp and dock of the Post Office was 2 inches or more below the grade of the concrete in many places, and there were numerous gaps between the concrete and the asphalt.

(52) The asphalt pavement was approximately 24 years old at the time it was re-

**560**

paired in 1991 by the installation of a 1 and ½ inch overlay of bituminous material. The expected lifespan of the asphalt lot in issue here was twenty years, assuming ordinary maintenance. The lot at the Burlington Post Office showed no sign of significant maintenance at any time since 1967.

(53) One of the features of the parking lot that the USPS contracted for under the Lease was an all-weather surface that provided drainage. By 1991, this feature was destroyed and the lot had failed structurally.

(54) The architecture and engineering firm hired by the USPS, ENG/6A, compared the cost of repairing the lot with an overlay of asphalt to the cost of more localized repairs, saw-cutting and repaving the many areas of failed asphalt. ENG/6A advised the USPS that the asphalt overlay was a cheaper method of repair than the localized repavements in view of the number of repavements required and the labor intensive nature of such repairs.

(55) The asphalt overlay did not provide the USPS with an upgrade or improvement of the leased facilities. Rather, it restored the lot to its condition at the beginning of the lease, less ordinary wear and tear, with reasonable maintenance having been performed. The overlay was an item of deferred maintenance required to restore the lot to good repair and tenantable condition.

(56) The reasonable cost of the paving repairs under the Work Order was $18,180.05.

*Architect Fees*

(57) In view of the scope of the repair work necessary in order to bring the Burlington Post Office into good repair and tenantable condition, it was reasonable for the USPS to engage the assistance of an architecture and engineering firm to make recommendations regarding the work to be done. It was reasonable for the USPS to seek professional assistance for the additional reason that much of the work involved technical matters calling for engineering expertise.

(58) The reasonable cost for architecture services was $3,195. This was a product of competitive bidding.

*Other Findings*

(59) The adjusted rent withhold of $46,543.57 (plus interest) reflects costs that were reasonably incurred by the USPS in contracting for repair work that was required lessor maintenance under the Lease.

(60) None of the repair work paid for by the rent withhold was preventive in nature, but was instead for repair of existing damage of such severity that the premises were no longer in good repair and tenantable condition.

(61) None of the repair work paid for by the rent withhold was for only cosmetic or aesthetic purposes, but was instead for repair of existing damage of such severity that the premises were no longer in good repair and tenantable condition.

(62) None of the repair work paid for by the rent withhold was necessitated merely by a desire by the USPS to project a particular "image" to the community, but was instead required for repair of existing damage of such severity that the premises were no longer in good repair and tenantable condition.

(63) Joseph Penner testified that if the adjusted withhold figure of $46,543.57 had been the original demand of the USPS, rather than $61,971.86, he would have paid this amount out of the accounts ($50,128) he garnished during the foreclosure action against the Finkelmans. He states that by such immediate payment, he could have avoided approximately $38,000 in attorneys' fees the Penners incurred in reaching a settlement agreement with the first mortgagee, which became insecure in view of the rent withhold and required the Penners to enter into a new financing agreement. The court specifically does not credit Joseph Penner's testimony that he would have immediately paid a $46,543.57 rent withhold from proceeds of the garnished accounts, and thus would have avoided the attorneys' fees generated in making the new arrangements with the first mortgagee.

## II.  CONCLUSIONS OF LAW

(1) The adjusted rent withhold[2] of $46,-543.57 charged by the USPS to the Penners includes only the reasonable cost of repairs and maintenance that are the lessor's responsibility under the Lease.  Consequently, the USPS did not breach the Lease in any regard, and the Penners are entitled to no relief from this court.

(2) The Penners suffered no damage and are entitled to no relief resulting from the USPS's action of September 21, 1992, imposing an original rent withhold of $61,971.86, and the USPS's subsequent action of December 11, 1992, reducing the withhold to $46,-543.57.  The original overstatement of the withhold did not, under the findings of the court, cause the Penners to incur additional attorneys' fees in connection with their relationship with the first mortgagee on the property.  The Penners did in fact incur such fees, but the fees would have been incurred even if the rent withhold had been imposed at the level of $46,543.57, rather than $61,-971.86, on September 21, 1992.

(3) Neither party is entitled to declaratory relief, the court having resolved the actual controversies before it.

## III.  DISCUSSION

Plaintiffs David S. Penner and Jason W. Penner (lessors) seek money damages, a declaratory judgment, and eviction of the United States Postal Service (lessee) from the Burlington Post Office on the basis of alleged breach of the Lease by the USPS.  The USPS is withholding from rental payments otherwise due to the Penners the sum of $46,543.57.  The USPS spent this amount (and more) on work done on the Burlington Post Office in 1991, and claims that the $46,-543.57 expenditure was entirely for items of "lessor maintenance" under the Lease, which the lessor improperly failed and refused to do.

The Penners do not dispute the right of the USPS to withhold rent to cover the cost of legitimate and necessary repairs that are the responsibility of the lessor under the Lease.  They contend, however, that much of

the work actually performed on the Burlington Post Office, and charged to them, was not truly the responsibility of the lessor under the terms of the Lease.

The resolution of this case turns on determination of disputed factual issues.  The findings of the court, set out above, establish that the entire sum of $46,543.57 expended by the USPS and charged to the Penners was in fact for reasonable and necessary repairs that are the responsibility of the lessor under the Lease in question.  Consequently, the Penners are entitled to no relief under their complaint.

The legal framework for determination of the issues before the court is straightforward.  The Penners do not dispute the right of the USPS to withhold rent to pay for repairs to the leased premises that are the responsibility of the lessor.  *See, e.g., McClure v. United States,* 382 F.Supp. 988 (D.Kan.1974).  The Penners have stipulated that there is no issue of the adequacy of notice in this case; that is, the USPS properly gave the lessor notice of its intention to contract for repairs to the leased premises and to impose a rent withhold to recover the cost of those repairs.

Because the USPS has used the self-help remedy of a rent withhold, the USPS must be assigned the burden of going forward with the evidence to show that the Penners breached the Lease by failing to make repairs required by the Lease.  Further, the USPS has the ultimate burden of proving both that the Penners are liable for the particular work performed and that the cost of the repairs was reasonable.

The parties have agreed that the repair work to be reviewed by the court falls into five categories: interior painting, exterior work, drainage pipe work, paving work, and architect's fees.  Accordingly, the court's discussion of the issues will be set forth under those headings.

---

**2.**  The Penners do not contest the common-law right of the United States Postal Service to withhold rent to pay for repairs to the property that are the responsibility of the lessor. *See, e.g., McClure v. United States,* 382 F.Supp. 988 (D.Kan.1974).

*Interior Painting*

■ The USPS has charged the Penners $17,638.54 for interior painting done in 1991.[3] The Penners do not contest their liability for interior painting under the Lease[4] or the fact that the interior of the Burlington Post Office had not been painted since 1981 or 1982. The USPS made repeated requests for repainting of the interior during the years before 1991, and the Penners were in clear breach of their responsibilities under the Lease. Nonetheless, the Penners claim that their responsibility for the repainting should not exceed $5,799.72. (Joint Stipulation, ¶ 46.)

As the evidence developed at trial, it became clear that the Penners, at least at first, misunderstood the scope of the interior painting work actually done at the Post Office. The plans and specifications written by the engineering firms, ENG/6A, called for a primer coat and two finish coats. The Penners argue that such a scope of work would be unreasonable and beyond their responsibility under the Lease. Whatever may be the merit of such a contention, all of the evidence showed that the cost paid by the USPS (and charged to the Penners) covered only spot priming and one finish coat.[5] The court understands there to be no contest that this falls well within the painting responsibility of the lessor; if there remains any such contention, the court finds and concludes that such a scope of work was clearly reasonable and necessary in this case.

Ultimately, the Penners' challenge to the rent withhold regarding interior painting reduces to a claim that the USPS paid an unreasonable amount to secure spot priming and one finish coat throughout the interior of the Post Office. Plaintiffs presented an expert who testified that a lower cost per unit should have been obtainable in the Burlington area in 1991. However, the court finds

that the expert's testimony was flawed in material respects because it did not account fully for priming costs or for administrative, overhead, or profit figures that would be included in the final cost to the owner/lessor.

Plaintiffs' cost evidence is unpersuasive for even more fundamental reasons. What is required of the USPS in securing repairs that the lessor has failed to make is the accomplishment of the repairs at the minimal cost reasonably available. *Datronics Engineers, Inc. v. United States,* 418 F.2d 1371, 1379, 190 Ct.Cl. 196 (1969). Here, the cost was a result of competitive bidding. Further, other bids made by painting contractors several years before 1991 were of similar magnitude to the eventual contract price. The USPS has easily carried its burden to show that it secured the interior painting work at a reasonable cost.

The discussion immediately above, grounded upon the findings of fact set forth earlier, is fully sufficient to explain the court's resolution of the interior painting issues presented in this case. More should be said, however. The evidence presented to the court showed that the interior of the Burlington Post Office was in gross disrepair by 1991. Many of the walls, particular those on the inside of exterior walls were horribly water-stained. In places, paint was entirely worn off, and concrete blocks showed through. The finish of the walls was so deteriorated that, in widespread places, material would rub off on a person who came in contact with a wall.

The interior walls had not been painted for nearly ten years, and extensive water damage had occurred in the interim. For the Penners to complain about the cost of the competitively bid painting work is not merely legally futile, but strikes the court as disingenuous. The Plaintiffs were in total breach

---

3. The parties have stipulated that $128.04 for floor patching was properly charged to the Penners.

4. Paragraph 7 of the Lease required the lessor to "maintain the demised premises ... in good repair and tenantable condition ..." The Lease also specifically provided in paragraph 7 that "[d]uring the continuance of the lease, the interior of the building ... shall be repainted at least

every five (5) years unless required more often because of damage from fire or other casualty ..."

5. The painting contractor, at his own cost, applied more finish coats in many places in order to achieve a satisfactory appearance. Neither the USPS or the Penners were charged for these extra coats.

of their maintenance responsibilities. They had ample opportunity to make the needed repairs by making their own arrangements. The interior condition of the Post Office was deplorable, and the USPS acted in a reasonable manner to obtain necessary repairs in order to restore the walls to good repair and tenantable condition. The evidence supporting the position of the USPS was not merely persuasive, but was overwhelming.

### Exterior Work

▪ The only exterior work charged to the Penners in the adjusted rent withhold of $46,543.57 was for patching walls at a cost of $1,479.87. The Penners were first given notice in September 1992 of rent withhold of $61,971.86. As a result of the Penners' appeal within the USPS chain of command, the USPS reduced the withhold by $15,428.29, all of which related to exterior work. In the adjusted withhold, the USPS no longer held the Penners responsible for pressure cleaning, tuckpointing masonry, or painting of the exterior of the Burlington Post Office.

The Lease provides that the lessor is required to maintain the demised premises in good repair and tenantable condition. This includes the interior and exterior of buildings and other appurtenances. The Lease creates additional specific duties regarding interior painting, but it says nothing further about exterior maintenance.

By 1991, the exterior of the Burlington Post Office was in a state of extreme disrepair. The exterior paint was largely worn away, and the paint that remained was peeled and cracked. Worse yet, the underlying stucco, a material not designed for exposure to the elements without a protective coat of paint, was exposed in numerous places and was extensively cracked, allowing water to penetrate into the interior of the building. The stucco had deteriorated in many places, and pieces had completely fallen off the building.

In view of the deterioration of the exterior of the building, the court easily finds that the patching work charged to the Penners in the adjusted rent withhold is required lessor maintenance under the terms of the Lease. The exterior of the building had apparently not been painted since its construction in 1967. By 1991, the obvious disrepair of the building went far beyond "cosmetic" problems, as the Penners contend, and had reached a condition of damage and deterioration to the point that the walls did not even prevent water penetration (as the interior of the building bore witness).

The Penners urge upon the court a construction of the Lease such that it is never the lessor's responsibility to paint or maintain the exterior of any building since painting is merely cosmetic. The court rejects this interpretation as without foundation under the Lease. The lessor is responsible for keeping all of the premises in good repair and tenantable condition, including building exteriors. The Lease creates, it is true, no duty upon the lessor to keep the exterior painted for purely aesthetic reasons, for reasons merely of appearance, or for only cosmetic purposes. Nonetheless, if the exterior is not painted for long, extended periods of time, as here, the eventual outcome is certain to be deterioration and decay of the underlying elements of the exterior walls, so that the walls do not even perform the basic function of preventing water from entering the building. When this happens, the shortcomings of the exterior walls have gone beyond aesthetic or cosmetics problems, and have reached a state of disrepair that gives rise to the lessor's duty to perform maintenance and repair. Such repair would, in such an advanced state of deterioration, include repainting, since the repainting would then not be for only aesthetic purposes. Indeed, Joseph Penner, who testified for Plaintiffs as an expert in post office maintenance expressed precisely this point in a letter he wrote to a USPS real estate specialist in 1974 concerning the Burlington Post Office, wherein he wrote, in part, "I do, however, agree that exterior painting is a lessor responsibility in the event said painting is required for maintenance purposes as opposed to aesthetic reasons." (GE B.)

The maintenance responsibilities established by the lease are clear enough, as a legal matter. The lessor must keep the premises in good repair and tenantable condition. The lessor has no duty for preventive

maintenance or for work that is only for aesthetic or cosmetic purposes. Despite the relative clarity of these principles, the Lease provisions have led to repeated disputes over maintenance between these parties and many other parties who have signed USPS lease forms similar to the one before the court. Review of the Lease shows why this result is not surprising. No one is assigned responsibility for exterior work *until* a state of deterioration is reached. A sensible owner paints the exterior of buildings on a regular basis, to prevent the decay that will eventually occur if no painting is done. Under the provisions of paragraph 7 of the Lease, however, no party is under a contractual duty to paint the exterior regularly or to do any other exterior maintenance until a point of advanced disrepair is reached. The predictable result is buildings that look bad, yet no duty of repair by the lessor has yet arisen. Inevitably, the lessee is dissatisfied with the leased premises but has no recourse to require the lessor to make the premises look better.

It is this circumstance, most likely, that led the USPS to argue in this case that the lessor has a special duty to keep the premises in a condition consistent with the "image" of the United States Postal Service. To the extent this argument suggests a higher standard than "good repair and tenantable condition," the court rejects the concept of "image" as having any influence on the lessor's obligations under the Lease. The parties bargained for good repair and tenantable condition, not for some higher level of maintenance that might enhance the image of the USPS. A positive, fresh-paint image for the USPS may well be a salutary objective, but the lessor cannot be made to pay for it, insofar as building exteriors are concerned, under this Lease.

The Penners contend that they suffered recoverable consequential damages when the USPS first announced a rent withhold of over $61,000, and then, three months later, deleted nearly all of the exterior work and reduced the withhold to $46,543.57. Testimony showed that the rent withhold caused the first mortgagee to take action to protect its mortgage, and the Penners apparently incurred $38,000 in attorney's fees in reaching a new agreement with the mortgagee. Joseph Penner testified that if the rent withhold had not included exterior items and had been calculated at $46,543.47 at the outset, he would have used the $50,000 available to the Penners in accounts they had garnished from the Finkelmans to immediately pay off the withhold before the first mortgagee could have had reason to become insecure. By such immediate payment, Joseph Penner testified, the Penners would have avoided the $38,000 cost in attorney's fees. The court rejects this claim.

The court has found as a fact that it does not credit the testimony by Joseph Penner that he, as agent for the Penners, would have immediately paid in full the $46,543.57 obligation to the USPS if the USPS had demanded only that amount in September 1992. Joseph Penner is managing agent for the Penners for all aspects of their interest in the Burlington Post Office. Every action the Penners have taken before and during this litigation directly contradicts the assertion that they would have immediately paid $46,543.57 to the USPS, if only that amount had been demanded in the first instance. The Penners have adamantly and consistently denied liability for all but a small portion of the repairs contracted for by the USPS. Thus, for lack of causation, the Penners' claim for recovery of the $38,000 cost in attorney's fees fails, and is denied.

### Drainage Pipe Work

Within the rent withhold, the USPS is charging the Penners $5,922.07 for work performed to repair a drainage pipe and the depression in the asphalt parking lot caused by the pipe failure. The depression ran through an extended portion of the lot along one side of the Post Office. It varied in depth from 3″ to 6″ for the most part, although it had, by 1991, reached a depth of nearly 10″ in one area. This area was barricaded off in 1991 to prevent injuries to postal employees or members of the public.

The depression resulted from a failure of the sub-base beneath the asphalt as a result of separations with the drainage pipe. The depression represented a structural failure of

the asphalt. It impeded postal operations by causing mail buggies to tip over on occasion and, at least to the area of most severe depression, by posing a safety hazard. The depression, in its deepest area, rapidly worsened in 1991.

Repair of the depression in the asphalt parking lot was the lessor's responsibility under the Lease. The asphalt had failed. Without question, the area in question was no longer in good repair and tenantable condition. In fact, the situation was unstable, and conditions had worsened to the extent that the USPS had to barricade off a portion of the depression in 1991. None of the witnesses for the Plaintiffs actually viewed the depression in person, but testified and gave opinions of "good repair" based only upon seeing photographs. Their testimony is simply not persuasive when compared with the testimony of the field inspector for the architectural firm and the postal workers who observed the depression every day and whose operations were impeded.

All of the repairs performed on the drainage pipe depression were necessary, including lamping, saw cutting, backfilling, excavating, and preparation of new base. (The all-weather surface, a 1 and ½″ asphalt layer placed over the base, is discussed in the following section.) The cost of $5,922.07 is reasonable.

*Paving Work*

The question of whether the paving work paid for by the USPS constitutes lessor maintenance under the Lease is, to the court's mind, the only close question presented in this litigation. The lessor's responsibility for all the repair work discussed above is abundantly clear, with overwhelming evidentiary support for the legal position taken by the USPS. On the issue of paving, however, there is competent and significant evidence on either side of the issue.

Paving work was done on the west parking lot of the Post Office and the south driveway. These are areas used primarily for employee operations and parking. Large postal trucks and smaller vehicles maneuver in this area, and postal buggies (small canvas carts with 4″ or 5″ wheels) are regularly pulled across

this pavement. There is a separate customer parking lot not involved in this litigation.

The USPS spent $18,180.05 to repair the paving in the parking area. The work included patching cracks ($546.75), painting ($405), repairing parking barriers ($124.74), and placing a 1 and ½″ bituminous layer ($17,103.56) over the full parking area. The Penners have stipulated to a necessary repair cost of $546.75 for patching cracks, but they contend that the paving and repainting of the entire lot constituted an "upgrade" for which the lessor is not liable, and that repair of the parking barriers was required only because of the negligence of the USPS.

Under the Lease, the lessor is required to keep the premises, including appurtenances, in good repair and tenantable condition. It is not required to perform preventive or cosmetic maintenance. The lessor's duty of maintenance or repair (except as to interior painting) arises only when the premises have deteriorated to such a point as to have fallen out of good repair and tenantable condition. With respect to paving, the official policy of the USPS favors localized repairs. USPS Handbook RE–1 provides, in part:

> § 745.4 Localized Repairs—Localized repair of distressed pavement areas with an overlay is normally less expensive than complete pavement replacement and can be adequate in most cases. The Postal Service is not entitled to completely new pavement if localized repairs are likely to provide driveway, parking, and maneuvering areas in a satisfactory condition in accordance with the terms of the lease contract.

(JE 31.)

The 1 and ½″ asphalt layer placed over the parking lot at the Burlington Post Office was not a "complete pavement replacement" as that term is used in § 745.4. A complete replacement involves removing the existing asphalt, repairing and rebuilding the subbase and base, and applying a new all-weather asphalt surface of sufficient thickness to meet original specifications. The method of repair used by the USPS in Burlington, the patching of large cracks and the installation of a 1 and ½″ overlay, was much less expen-

sive than installing completely new pavement.

■ Whether or not the overlay was the responsibility of the Penners, as lessors, turns on the condition of the parking lot in 1991 when the repair work was done. The relevant findings and conclusions of the court, set forth in Sections I and II of this opinion, are that the lot was in a failed and deteriorated condition of such severity that it was no longer in "good repair and tenantable" condition. At trial, there was sharply disputed evidence regarding the condition of the lot.

Plaintiff presented the testimony of qualified experts (Joseph Penner, C. Randall Wedding, and Alfred C. Maevis) regarding the condition of the parking lot. Penner is experienced in the maintenance of leased postal facilities, having managed many such facilities during his career. Wedding is an architect whose work includes designing new and restored asphalt parking lots. Maevis is an engineer of long experience who worked in the 1970's for the Postal Service as Assistant Postmaster General for Real Estate and Buildings. These witnesses identified possible localized problems in the Burlington parking lot but voiced the opinion that the lot was fully functional and, overall, was in good repair and tenantable condition. They testified on the basis of photographs, none of them having actually seen the parking lot in Burlington at any time prior to the 1991 repairs.

The court considers, however, that the USPS presented more persuasive evidence concerning the condition of the parking lot and the necessity for repair by means of an overlay. The architectural and engineering firm of ENG/6A actually inspected the parking lot in early 1990. The work of that firm is thus based on the personal observations and field notes of an employee who inspected the premises and saw the conditions firsthand. The expert testimony of Tom Wilson (civil engineer) and Doug Campbell (architect) proved persuasive to the court in reaching its findings. Further, the testimony of employees of the Burlington Post Office, who experienced the conditions of the lot every workday, appeared to the court to be most reliable.

The court notes that even Plaintiff's expert, C. Randall Wedding, testified that the normal life-span of an asphalt parking lot is 1 to 20 years. Tom Wilson gave the same testimony. The lot in question was constructed in 1967, with no signs of significant maintenance since that time. It was 24 years old at the time of repair. It was thoroughly cracked and "alligatored," with drainage that was not serviceable. The court accepts specifically Tom Wilson's assessment that 70% of the back lot had failed and the lot was at the end of its life-span. As Doug Campbell testified, a significant feature of an asphalt lot at the Burlington Post Office was its "all-weather" function, accomplished by a hard surface that directed storm water for the purposes of removing it from the lot. By 1991, this function was destroyed.

In view of the condition of the lot, the Lease required the lessor to perform maintenance to bring the lot into good repair.[6] When the lessors did not respond to requests for such maintenance, the USPS acted to have the repair work done and to charge the cost to the lessors in the form of a rent withhold. The remaining question before the court is whether the scope and cost of repair were reasonable.

■ In making its recommendations to USPS, ENG/6A considered two repair options: (1) cutting and patching for localized repair, or (2) providing an overlay over the entire area. Either option was in addition to the need to provide a paved surface for the area over the repaired drainage pipe. It was the opinion of ENG/6A, by and through Tom Wilson, that the overlay approach would be less expensive than cutting and patching in view of the extensive number of patches that would be required. Additionally, the overlay would permit the restoration of drainage, whereas cutting and patching would not. Wilson estimated that three times as much area could be overlaid as could be cut and patched for the same money due to the labor

---

**6.** The parking barricades also required lessor maintenance as a result of normal wear and tear. The court accepts the testimony of Alfred Maevis, Plaintiff's witness on this point.

intensive nature of saw-cutting, backfilling, and patching. Moreover, if cutting and patching were used, the significant area over the drainage pipe would still have to be paved, a matter that could be inexpensively addressed as a part of the overlay of the full lot.

The USPS actually reduced the cost of the work recommended by over $9,000 by reducing the thickness of the overlay from 2″ to 1 and ½″ and by eliminating the fabric overlay recommended by ENG/6A.[7] The final costs of $17,103.56 for the overlay, $546.75 for patching large cracks, $405 for painting lines, and $124.74 for repairing parking barriers are reasonable.

### Architect's Fees

■ In view of the scope of the work and the technical nature of portions of it, the court finds that architect's fees are a reasonable part of the cost of the repair project. The fees in this case in the amount of $3,195 were the product of competitive bidding, and are reasonable.

### IV. CONCLUSION

For reasons set forth above, the court finds that the entire amount of the rent withheld by the USPS, $46,543.57, represents the reasonable cost for necessary repairs that are the Penners' responsibility under the Lease. Accordingly, the court will enter a judgment in favor of the Defendant.

### JUDGMENT

This action came on for trial before the Court, Honorable P. Trevor Sharp, Magistrate Judge, presiding,[1] and the issues having been duly tried and a decision having been duly rendered in the Memorandum Opinion filed contemporaneously herewith,

7. Ironically, Plaintiffs argued at trial that this *reduction* in the scope of the repair work may not have been reasonable since it reduced the expected life-span of the repaired asphalt lot. It was Plaintiff's failure to perform this repair work themselves, however, that forced the USPS to have the work done. The USPS was entitled to spend only that amount of money reasonably required to bring the lot up to "good repair." It is undoubtedly true that a prudent owner might go beyond that, at some marginal cost, and ob-

**IT IS ORDERED AND ADJUDGED** that the Plaintiffs take nothing, that this action be dismissed on the merits, and that the Defendant recover of the Plaintiffs its costs of action.

tain a lot that might save maintenance costs in the future. Plaintiff did not respond to Defendant's many requests for repair by the lessor, and the USPS had to proceed with the minimum repair necessary to bring the lot up to the standard required by the Lease.

1. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).